IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DARNELL JACKSON,

                    Petitioner,                                    OPINION AND ORDER

          v.                                                       11-cv-737-wmc

WILLIAM POLLARD, Warden,
Waupun Correctional Institution,

                    Respondent.

          Petitioner Darnell Jackson has filed a petition for writ of habeas corpus under 28

U.S.C. § 2254, seeking relief from a prison disciplinary conviction that resulted in an

extension of his mandatory release date.   After conducting a preliminary review of

Jackson's petition, this court directed respondent to show cause why relief should not be

granted.  The respondent filed an answer, along with records from the relevant state court

proceedings.  Both parties subsequently submitted briefing on the viability of Jackson's

claim.  Because Jackson is not entitled to the relief sought, his petition will now be

denied.


                              BACKGROUND

          Jackson is currently incarcerated by the Wisconsin Department of Corrections at

the Waupun Correctional Institution.  He was previously confined at the New Lisbon

Correctional Institution ("NLCI"), before being transferred to the Wisconsin Secure

Program Facility ("WSPF") on November 13, 2004.  The reasons for Jackson's transfer

are outlined in a detailed conduct report (#1731337), charging him with inciting a riot and group resistance in violation of Wis. Admin. Code DOC §§ 303.18 and 303.20. These charges stemmed from an incident that occurred at NLCI on November 11, 2004, in which several correctional officers were seriously injured during a prison riot.

On January 26, 2005, Jackson appeared for a "due process hearing" along with a "staff advocate" appointed to assist him.  At that hearing, the adjustment committee found Jackson guilty of inciting a riot and not guilty of group resistance.  As a result, Jackson was placed in "adjustment segregation" for 8 days and "program segregation" for 360 days.  The adjustment committee also forfeited 179 days of previously earned credit for good conduct (*i.e.*, good-time credit), which extended Jackson's mandatory release date.

Jackson challenged his disciplinary conviction by filing a petition for certiorari review in Dane County Circuit Court, arguing that he was denied due process.   In particular, Jackson argued that (1) he was denied a fair hearing before an impartial decision-maker; (2) he was denied access to exculpatory video evidence; and (3) the evidence presented was insufficient to support his conviction.  Rejecting all of these claims, the circuit court affirmed the disciplinary conviction in a written opinion and dismissed Jackson's certiorari petition.  *See State ex rel. Jackson v. Buchler*, Dane County Case No. 05CV1862 (March 10, 2006).  On direct appeal, the Wisconsin Court of Appeals affirmed the circuit court's decision in an unpublished opinion.  *See State ex rel. Jackson v. Buchler*, No. 2006AP948 (Dec. 13, 2007).  On petition for further review, the

Wisconsin Supreme Court remanded Jackson's case for *in camera* review of certain video evidence.

A hearing was held for that purpose before the Dane County Circuit Court following remand.   After another round of appeals, the Wisconsin Supreme Court ultimately affirmed the disciplinary conviction in a lengthy, published opinion.   *See Jackson v. Buchler*, 2010 WI 79, 330 Wis. 2d 279, 793 N.W.2d 826 (Dec. 14, 2010).   In doing so, the Wisconsin Supreme Court summarized the relevant facts and procedural history of the disciplinary charges, which as the last opinion by a state court bear repeating here:

> At approximately 1:40 p.m. on November 11, 2004, several New Lisbon Correctional Institution security guards were attacked and injured by three inmates: Jamie Vest, Bernard Treadwell, and Alvin Kenney. The attack occurred at the A Unit officers' station, which is located between the A Unit Side 1 and Side 2 dayrooms. According to the subsequent investigation, many inmates participated in the assaults by purposefully rushing toward the officers' station and positioning themselves to participate in the riot.

> Although the attack itself appears not to have been recorded by security cameras, video footage of the Side 1 and Side 2 dayrooms was used in the investigation. Many inmates were disciplined as a result of their participation in the riot.

> At the time of the riot, Darnell Jackson was working in the prison barbershop, which abuts the Side 1 dayroom. There is no evidence or allegation that Jackson directly participated in the riot.

> Nevertheless, staff investigators uncovered information implicating Jackson as a leader responsible for inciting the attack. Two inmates who requested confidentiality stated that they had direct personal knowledge of the circumstances which led to the riot. Both stated that Jackson, who used the alias "Wiz," acted in a leadership position in a gang called the Vice

3

Lords. Both indicated that prior to the riot, Jackson met with the inmates and instructed them to assault the guards.[1]

A conduct report was issued, which cited Jackson for inciting a riot[2] and for group resistance.[3] The conduct report noted: "Tapes from the NLCI A Unit and NLCI exterior cameras from 11/11/04 have been utilized by the investigators of the 11/11/04 riot."

As set forth in the conduct report, the informant referred to as CI #1 stated in part:

> Darnell Jackson is calling it for the Vice Lords and P–Stones. I saw inmate[s] putting their boots and gloves on and I knew something was going to happen. Vest, Treadwell, Darnell Jackson and Alvin Kenney were all huddled up first in the hallway. All the people who assaulted the staff are V.L. and P–Stones (Rangers). I also saw Lipsey and Ward outside in the hallway talking to "Wiz" (AKA Darnell Jackson.) I saw Wiz in the hallway, everybody had on boots and gloves.

The informant referred to as CI #2 stated in part:

> Lipsey (Samuel) was on crutches and came back to the unit from HSU. Lipsey stated to the inmates on the unit that he saw Love being attacked and the guards had him on the ground and were beating him. Treadwell and Vest then went to Whiz (who is first in command) and told him about Love. Whiz was behind the incident. He stated to them, "You guys know what you have to do."

The conduct report concluded that "Jackson is in a leadership position with the Vice Lords, called for the assault to happen, and was

---

[1] At least two other inmates gave statements that appeared to implicate Jackson. One inmate stated that Jackson came out of the barbershop where Vest, Treadwell, and Kenney were located, and then returned to the barbershop prior to the assault. Another inmate stated that Jackson was "a five star general for the Vice Lords."

[2] Wisconsin Admin. Code DOC § 303.18 provides: "Any inmate who encourages, directs, commands, coerces or signals one or more other persons to participate in a riot is guilty of an offense. 'Riot' means a disturbance to institutional order caused by a group of 2 or more inmates which creates a risk of injury to persons or property."

[3] The latter is codified at Wis. Admin. Code DOC §§ 303.20, 303.03(4), but not repeated here since Jackson was ultimately acquitted of that charge.

talking to the three inmates who assaulted staff seconds before the assault took place." Further, it stated that the confidential informants "are believed to be credible as their statements were obtained separately. Neither inmate had knowledge of the other's statement." It determined that "[t]he statements were consistent with and corroborated one another."

Jackson was provided with a copy of the conduct report and a notice of his right to a hearing. He submitted an affidavit, which asserted that at no time did he talk with Treadwell, Vest, or Kenney, and that he had nothing to do with the attack. He further contended that he is no longer a member of the Vice Lords, that he was never a member of the P–Stones, and that he never acted in a leadership position with those gangs.

According to his affidavit, on the afternoon of the riot Jackson was in the prison barbershop cutting Inmate Piel's hair. He heard a loud commotion and saw inmates gathered around the TV monitor. Jackson contended that he left the shop for 15 seconds to look at the TV monitor, but he could not see what was happening and returned to the shop. After he finished cutting Piel's hair, Jackson left the shop. At that time, there was a commotion at the sergeant's desk, and he saw Treadwell, Vest, and Kenney swinging their fists and kicking someone. He proceeded towards his cell.

The Security Office granted Jackson's request to present the testimony of two inmates, Larry Piel and Bernard Treadwell. It denied Jackson's request to present the testimony of two additional inmates, Samuel Lipsey and Jamie Vest, and one Department of Corrections (DOC) officer, Captain Harrel. The office explained that Jackson did not provide good cause to demonstrate that the additional witnesses could provide essential testimony.[4]

During his administrative appeals, Jackson asserted that the denial of his request to call these witnesses was a due process violation. However, he has not renewed this argument in the circuit court, the court of appeals, or this court.

Jackson, Piel, and Treadwell testified at the hearing. The two confidential informants did not testify.

---

[4] Wisconsin Admin. Code DOC § 303.81(1) provides in part: "The accused may directly or through an advocate make a request to the security office for witnesses to appear at the major violation hearing.... Except for good cause, an inmate may present no more than 2 witnesses in addition to the reporting staff member or members."

The adjustment committee found Jackson guilty of inciting a riot and not guilty of group resistance. As a result of this disposition, Jackson's release date was extended by 179 days.

Lieutenant Pamela Zank completed form DOC–84, entitled "Disciplinary Hearing: Reasons for Decision and Evidence Relied on," (hereinafter, "Hearing Decision"). As provided in the Hearing Decision, the committee found it "more likely than not inmate Jackson committed the act of inciting a riot." The Hearing Decision explained that the committee "evaluated all the evidence, confidential statements and testimony and reached its conclusion that the statements in the conduct report are correct." It concluded that Jackson's testimony was "less credible" and that "inmate witness testimony [was] not credible."

The Hearing Decision form contained a section for the adjustment committee to set forth the physical evidence it relied upon in reaching its decision. That section provided that among other evidence,[5] the committee relied on "video" evidence in finding Jackson guilty.

Jackson timely appealed to Warden Buchler.[6]  Among other claims, Jackson contended that Lt. Zank's participation in the hearing violated DOC rules and his due process right to a fair and impartial hearing, and that there was insufficient evidence to establish his guilt. He asserted that Lt. Zank was among the officers who investigated the assault, that she had interviewed Jackson about the incident, and that she asked Jackson to sign a waiver of his hearing rights. Jackson made no claim regarding video evidence.

Warden Buchler affirmed the committee's decision, concluding that there was sufficient evidence to sustain its determination of guilt. He also found that "Lt. Zank did not have substantial involvement in the incident to warrant not being on the hearing committee."

Following the inmate complaint procedures outlined in Wis. Admin. Code Ch. DOC 310, Jackson filed two offender complaints with the institutional complaint examiner. His first complaint raised issues related to the statements of the confidential informants. That complaint was dismissed. His second complaint asserted that the committee violated Wis.

---

[5] The other evidence listed in the Hearing Decision includes: statement in the conduct report, other testimony, confidential witness statements, C–120, diagram, and gang coordinator credentials.

[6] *See* Wis. Admin. Code DOC § 303.76(7).

Admin. Code DOC § 303.82(2)[7] by permitting Lt. Zank to participate as a member of the adjustment committee. The institutional complaint examiner recommended that the complaint be dismissed, concluding that "Lt. Zank did not have substantial involvement in the investigative process." On review, the corrections complaint examiner found "no procedural error of consequence" and also recommended that the complaint be dismissed. Ultimately, the Secretary of the DOC accepted the recommendation and dismissed Jackson's complaint.

*Jackson,* 2010 WI at ¶¶ 6-23 (footnotes [renumbered] in original).

## OPINION

Jackson now seeks relief pursuant to 28 U.S.C. § 2254, arguing that he was convicted of disciplinary charges in violation of his right to due process.  As he did in state court, Jackson argues that he is entitled to relief for the following reasons:  (1) he was denied a fair hearing before an impartial decision-maker; (2) he was denied the right to present exculpatory video evidence at his disciplinary proceeding; and (3) there was insufficient evidence to support the adjustment committee's finding of guilt.  Jackson asks this court to expunge the disciplinary conviction and to restore his original mandatory release date.  For reasons set forth below, the court will deny Jackson's petition and dismiss this case.

In his petition for relief pursuant to 28 U.S.C. § 2254, Jackson raises the same claim adjudicated by the circuit court, the Wisconsin Court of Appeals and the Wisconsin Supreme Court.  When a state system issues multiple decisions, a federal

---

[7] Wisconsin Admin. Code DOC § 303.82(2) provides: "No person who has substantial involvement in an incident, which is the subject of a hearing, may serve on the committee for that hearing. Committee members shall determine the subject matter of the hearing in advance in order to allow replacement of committee members if necessary and thereby avoid the necessity of postponing the hearing."

habeas corpus court typically considers "the last reasoned opinion on the claim." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012) (unless a state court adopts or incorporates the reasoning of a prior opinion, 28 U.S.C. § 2254 requires federal courts to review one state decision) (citation omitted).   Because the Wisconsin Supreme Court addressed his claims on the merits, Jackson must show that its adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  This he wholly fails to do.

## I.        Standard of Review

The standard outlined in § 2254(d)(1) is exacting and "highly deferential," *Burt v. Titlow*, — U.S. —, 134 S. Ct. 10, 15 (2013), demanding that state courts be given "the benefit of the doubt." *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786 (2011).  To prevail, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.  A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court *or* reaches a different conclusion than the Supreme Court based on materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 404-08 (2000) (emphasis added).  A state court unreasonably applies clearly established precedent if it identifies the correct governing legal principle but unreasonably applies

that principle to the facts of the case. *See Brown v. Payton*, 544 U.S. 133, 141 (2005). In addition to the "formidable barrier" posed by this standard, *Titlow*, 134 S. Ct. at 16, the petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In the disciplinary hearing context, a prisoner's rights, if any, are governed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Wolff v. McDonnell*, 418 U.S. 539, 557 (1974). Prisoners charged with institutional rules violations are entitled to rights under the Due Process Clause only when the disciplinary action may result in a sanction that will infringe upon a constitutionally protected interest. *See Sandin v. Conner*, 515 U.S. 472 (1995). A prisoner challenging the process that he was afforded in a disciplinary proceeding must meet two requirements: (1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon deprivation of that interest were constitutionally deficient. *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).

As the result of his disciplinary conviction, Jackson lost 179 days of good-time credit, which extended his mandatory release date. A Wisconsin inmate has a protected liberty interest in his earned good-time credit, which is authorized by state statute. *Santiago v. Wire*, 205 Wis. 2d 295, 318, 556 N.W.2d 356 (Ct. App. 1996). Thus, Wisconsin prisoners such as Jackson have the right to due process in disciplinary actions that result in the loss of earned good-time credits. *See Cochran v. Buss*, 381 F.3d 637, 639 (7th Cir. 2004); *see also Walker v. O'Brien*, 216 F.3d 626, 633 (7th Cir. 2000) (adhering to circuit precedent that § 2254 is the correct vehicle for contesting loss of good-time

credit in prison disciplinary proceedings).

Prison disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." *Wolff v. McDonnell*, 418 U.S. 539, 561 (1974). The minimum amount of procedural due process required for these proceedings includes: (1) advance written notice of the disciplinary charges; (2) hearing conducted by an impartial tribunal; (3) an opportunity to call witnesses and present documentary evidence not unduly hazardous to institutional safety and correctional goals; and (4) a written statement by the fact finder of the evidence relied upon and the reason for the disciplinary action. *Id.* at 563-67, 570-71. There must also be "some evidence to support the findings made in the disciplinary hearing." *Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 457 (1985).

The Wisconsin Supreme Court identified *Wolff v. McDonnell* as the governing legal precedent and examined each of Jackson's three due process challenges he repeats in this case. For the reasons set forth below, Jackson has established neither that the state court's application was contrary to *Wolff*, nor that its application was unreasonable. Therefore, his petition for a writ of habeas corpus must be denied.

## II.    Impartial Decision-Maker

First, Jackson contends that he was denied due process because Lieutenant Zank both questioned him at some point after the riot, and then served on the adjustment committee that presided over his disciplinary hearing. Having been a part of the

10

investigation, Jackson contends that Zank's subsequent participation on the committee deciding his discipline, if any, denied him of his right to a hearing conducted by an impartial decision-maker.

The Wisconsin Supreme Court recognized Jackson's right "to an impartial adjustment committee in disciplinary hearings to prevent 'such a hazard of arbitrary decisionmaking that it should be held violative of due process of law,'" but rejected his due process claim, finding that Lieutenant Zank's impartiality could not be reasonably called into question simply because of her limited involvement in the investigation. *Jackson*, 2010 WI 135, ¶¶ 74-75 (quoting *Wolff*, 418 U.S. at 571, 94 S. Ct. 2963).  The court went on to explain:

> The DOC has promulgated a rule that attempts to codify th[e] right [to an impartial decisonmaker].   Wisconsin Admin. Code DOC § 303.82(2) provides: "No person who has substantial involvement in an incident, which is the subject of a hearing, may serve on the committee for that hearing."
>
> The parties dispute the interpretation of the DOC rule. The respondents argue that the rule applies only when the committee member has had substantial involvement in the underlying events upon which the conduct report was based — here, the riot.  Jackson contends that the rule also applies when the committee member has had substantial involvement in the investigation of those events.

Ultimately the Wisconsin Supreme Court found that "need not resolve this question," cause under "either interpretation, the question is whether the committee member's prior involvement was "substantial."  *Id*. at ¶ 75.  The court explained:

> The record does not reveal that Jackson objected to Lt. Zank's participation in the adjustment committee at the time of the hearing. As a

result, the adjustment committee did not make any findings of fact regarding the extent of Lt. Zank's involvement.[8]

Without any findings of fact, we are left with only Jackson's allegations. Jackson alleges that Lt. Zank interviewed him after the riot, and that during the interview, Lt. Zank asked him to waive his hearing rights.

Perhaps because the record on this subject is so sparse, both parties attempt to supplement it. At oral argument, the respondents asserted that Lt. Zank met with Jackson for the purpose of delivering a copy of the conduct report. Yet, that assertion is not supported by the documentary evidence in the record. The conduct report reflects that H. Hermann, Jackson's appointed staff advocate, signed the report as the "staff member delivering copy to offender."

By contrast, Jackson characterizes Lt. Zank's question about waiver as "inappropriate." However, we note that "[a]n inmate may waive the right to a due process hearing in writing at any time," and it is standard protocol to provide inmates notice of the right to a hearing and the option to waive it. *See* Wis. Admin. Code DOC §§ 303.76(1)(c), 303.76(2).

If Lt. Zank did in fact have a substantial role in building the case against Jackson, then her impartiality might reasonably be questioned. Yet, there is nothing in the record to support such a conclusion. Based on this sparse record, we cannot conclude as a matter of law that Lt. Zank's involvement in the incident was "substantial."

*Id*. at ¶¶ 76-80 (footnote [renumbered] in original).

Due process does forbid officials who are directly or substantially involved in the factual events underlying the disciplinary charges, or the investigation of those events, from serving on the board hearing the charge. *Piggie v. Cotton*, 342 F.3d 660, 667 (7th Cir. 2003) (citing *Whitford v. Boglino*, 63 F.3d 527, 534 (7th Cir. 1995)). Nevertheless, adjudicators are entitled to a presumption of honesty and integrity. *Piggie*, 342 F.3d at 666 (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). The constitutional standard for

---

[8] Although the respondents assert that the warden and the inmate complaint examiner both made findings of fact that Lt. Zank's involvement was not "substantial," that determination is actually a question of law.

impermissible bias is high.  *Piggie*, 342 F.3d at 666 (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986)).

Here, Lieutenant Zank was not present during the riot that formed the underlying basis of the disciplinary conduct charges and had no involvement in that incident.  Her involvement with the ensuing investigation appears limited to asking Jackson whether he wished to have a full due process hearing on the conduct report or whether he intended to waive that right.  This neither establishes substantial involvement in the actual investigation, nor shows that there was any legitimate basis to question Lieutenant Zank's impartiality as a member of the adjustment committee.  On the contrary, this inquiry would be perfectly appropriate for an impartial adjustment committee to ask before proceeding with the hearing itself.  Jackson wholly fails to demonstrate that the Wisconsin Supreme Court's decision was incorrect or unreasonable for purposes of 28 U.S.C. § 2254(d)(1).

### III.    Sufficiency of the Evidence

Second, Jackson maintains that the evidence was insufficient to support his disciplinary conviction.  In particular, he argues that there was no evidence corroborating the statements made by the two confidential informants regarding his involvement in the riot.  Again, the Wisconsin Supreme Court disagreed, finding that the statements were sufficient evidence to find that it was:

more likely than not, he incited the riot.[9]  *See Santiago v. Ware*, 205 Wis. 2d

---

[9] In a prison disciplinary proceeding, the adjustment committee must find it "more likely than not" that the accused committed the violation. Wis. Admin. Code DOC § 303.76(6)(b).

295, 337, 556 N.W.2d 356 (Ct. App. 1996). The question is "whether reasonable minds could arrive at the same conclusion reached by" the adjustment committee. *State ex rel. Richards v. Traut*, 145 Wis. 2d 677, 680, 429 N.W.2d 81 (Ct. App. 1988).

The primary evidence linking Jackson to the riot were the statements of two confidential informants, CI #1 and CI #2. Jackson acknowledges that these statements were admissible under DOC rules.[10]   He also acknowledges that without more, the statements would be sufficient evidence of guilt to satisfy due process.[11]

We agree. If believed, the confidential informants' accounts establish that Jackson was "huddled up" in the hallway talking with Treadwell, Vest, and Kenney shortly before those inmates attacked the guards. Further, if believed, they establish that Jackson told the other inmates: "You guys know what you have to do." Under the circumstances, reasonable minds could interpret Jackson's alleged statement as an instruction to attack the guards. Reasonable minds could conclude that the confidential informants' statements, along with other facts set forth in the conduct report, established that it was more likely than not that Jackson incited the riot.

*Jackson*, 2010 WI 135, ¶¶ 55-57 (footnotes [renumbered] in original).

Before the Wisconsin Supreme Court, Jackson also asserted "that the video evidence contradict[ed] the informants' statements, rendering them not credible." *Id*. at ¶ 58. During oral argument, the Supreme Court viewed "a portion of the video footage, which Jackson identifies as the crux of his argument."[12]   *Id*. at ¶ 59.

---

Thus, the DOC's burden is lower than a prosecutor's burden in a criminal trial. Further, an adjustment committee may consider "any relevant evidence, whether or not it would be admissible in a court of law." Wis. Admin. Code DOC § 303.86(2)(a).

[10] Although Jackson raised questions about the admissibility of the confidential informants' statements in the circuit court and in the court of appeals, he does not renew those arguments here.

[11] At oral argument, his counsel conceded: "The evidence of the two confidential informants alone . . . , while extremely weak, would under the case law, again, if there was no other evidence, would be sufficient."

[12] Although we directed the parties to describe in relevant detail the events depicted in the two-minute clip, the parties' stipulation lacks sufficient detail for us to evaluate Jackson's claim that the video evidence undermines the confidential informants' statements. During oral argument, both parties went beyond the stipulated facts. Although they appear to largely agree on the identities of individuals and events that are depicted in the clip, they argue

As the Supreme Court goes on to explain:

This two-minute clip depicts Side 1 of New Lisbon's A Unit on the day of the riot. Jackson asserts that the clip begins approximately one minute before the guards were attacked and two minutes before additional guards responded to the riot.

Our discussion here relies on Jackson's representations about the individuals and events depicted. Accordingly, we evaluate the video evidence in the light most favorable to his claim.

Throughout the duration of the clip, the camera sporadically pans around the Side 1 dayroom. The door of the barbershop, which abuts the dayroom, is sometimes but not always visible in the shot.

According to Jackson's representations to the court, at approximately 49 seconds into the clip, the camera pans to a static shot depicting Vest, Treadwell, Kenney, and other unnamed inmates. Jackson is not present. The inmates are gathered in a loose cluster not far from the barbershop door. At the time that the inmates are first depicted, they are walking in the direction of the guard station. The camera remains on the inmates for a total of three seconds before panning away.

During the following 78 seconds, the footage intermittently depicts the barbershop door, which remains closed. Several guards emerge from behind the guard station. Shortly thereafter, the guards sprint off camera toward Side 2 of the A–Unit. Jackson infers that at that point, the guards are responding to the riot.

The two-minute segment of video footage neither affirms nor disproves the confidential informants' assertion that Jackson met with the assailants shortly before the attack. It does not provide a consistent shot of the barbershop door or the hallway outside the barbershop where the meeting allegedly took place. Likewise, it provides no more than three seconds of footage depicting the assailants' actions immediately prior to the riot.

Rather, by the time the camera first pans to the assailants, they have already assembled as a group and are already advancing toward the guard station. From the footage, it is impossible to determine how long the assailants had been congregating near the barbershop door. Likewise, it is impossible to determine whether any other inmates, including Jackson, were present before the assailants were first depicted. Certainly, it is

---

about what inferences should be drawn from these facts.

conceivable that Jackson met with the inmates, "called" the riot, and returned to the barbershop in the seconds or minutes before the security camera panned to the assailants.

Jackson concedes that the alleged meeting with the assailants could have taken place prior to the events depicted in the video. Yet, he contends, a meeting that occurred but was not captured on tape would be inconsistent with the conduct report's assertion that Jackson met with the assailants "seconds before" the riot occurred.[13]

Jackson's contention is not supported by the events actually portrayed in the video clip. Rather than contradicting the informants' statements, reasonable minds could conclude that the video clip and the informants' statements are consistent. The video shows that Treadwell, Vest, and Kenney did in fact assemble outside the barbershop shortly before attacking the guards. To that end, the clip may actually corroborate one aspect of the confidential informants' account.

*Jackson*, 2010 WI 135, ¶¶ 59-67 (footnotes [renumbered] in original).

For this reason, the Wisconsin Supreme Court found:

the video evidence is inconclusive and neither undermines nor contradicts the informants' statements. With or without the video evidence, reasonable minds could arrive at the same conclusion reached by the adjustment committee. Accordingly, we conclude that the evidence of Jackson's guilt was sufficient to satisfy due process.

*Id*. at ¶ 68.

Here, Jackson was charged with inciting a riot in violation of Wis. Admin. Code

DOC § 303.18, which provides as follows:

Any inmate who encourages, directs, commands, coerces or signals one or more other persons to participate in a riot is guilty of an offense. "Riot"

---

[13] *See supra*, ¶ 12. At oral argument, the following exchange occurred between counsel for Jackson and the court:

Court: Is it possible that Mr. Jackson could have been walking with them or huddled with [the assailants] before the tape starts or at some time when the camera is not on that group?

Counsel: It is possible that he could have been in the hallway before the tape started, but that would not be "seconds before" [the riot began].

means a disturbance to institutional order caused by a group of 2 or more inmates which creates a risk of injury to persons or property.

After considering the video evidence and all of the statements in the conduct report, the adjustment committee found that it was "more likely than not" that Jackson incited a riot in violation of this provision.  Statements in a conduct report, standing alone, may be relied upon by prison officials as a basis for determining guilt.  *See Culbert v. Young*, 834 F.2d 624, 631 (7th Cir. 1987); *see also Saenz v. Young*, 811 F.2d 1172, 1174 (7th Cir. 1987) (upholding a disciplinary conviction based on an officer's written report).

To the extent that Jackson disagrees with the evidence, the committee found that independent statements from the confidential informants corroborated each other, while Jackson's version of the events was inconsistent with the video evidence and, therefore, not credible.  A federal habeas corpus court may not weigh evidence when reviewing a prison disciplinary proceeding.  *See Hill*, 472 U.S. at 455.  A disciplinary conviction comports with due process as long as it was supported by "some evidence." *Hill*, 472 U.S. at 455; *Webb v. Anderson*, 224 F.3d 649, 652 (7th Cir. 2000).  Because there was at least a modicum of evidence to support the disciplinary conviction in this instance, the adjustment committee's decision must be upheld.  Jackson does not show otherwise and he does not demonstrate that the Wisconsin Supreme Court's decision was incorrect or unreasonable in light of clearly established United States Supreme Court precedent.


IV.    **Denial of Exculpatory Evidence**

Third, Jackson contends that he was denied due process because he was not allowed to present video evidence in connection with his petition for certiorari review in

17

circuit court, which would have shown that he was not involved in the riot.  In contrast, the Wisconsin Supreme Court found no such violation, noting that the video evidence was, at best, inconclusive, and therefore not exculpatory.

Having concluded that the video evidence neither undermines nor contradicts the confidential informants' statements — and that it may in fact corroborate them—we turn next to briefly address Jackson's argument regarding exculpatory evidence. *Brady v. Maryland* and its progeny provide that the government may not withhold exculpatory or impeaching evidence from a defendant in a criminal trial.[14]   Jackson asserts that the government's obligation to disclose exculpatory or impeaching evidence also applies in the context of a prison disciplinary proceeding, and that the adjustment committee was obligated to produce this video evidence.

The respondents counter that there is no controlling law applying *Brady*'s requirements to prison disciplinary proceedings.[15]  If this court were to recognize a *Brady*-like claim in this context, however, the respondents urge us to conclude that its application must be limited by the "needs and exigencies of the institutional environment." *See Wolff*, 418 U.S. at 555, 94 S. Ct. 2963.

In the sufficiency of evidence section set forth above, we determined that the video evidence is inconclusive. It is that same determination that leads us to conclude that we need not and should not decide in this case whether any version of *Brady* — limited or otherwise — applies in the prison disciplinary setting.

Here, we conclude that the adjustment committee's failure to provide the video footage to Jackson did not violate his due process right to a fundamentally fair hearing. The video footage adds nothing of evidentiary value for either party.[16]

---

[14] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963); *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936, 144 L.Ed.2d 286 (1999).

[15] The United States Supreme Court has not addressed this question. The Seventh Circuit Court of Appeals has concluded that inmates have a qualified right to the disclosure of exculpatory evidence. *See Piggie v. McBride*, 277 F.3d 922 (7th Cir. 2002). We are not bound by the Seventh Circuit's interpretation of the United States Constitution.

[16] We are cognizant that a *Brady* claim is not coextensive with a sufficiency of the evidence claim. Under some circumstances, a criminal defendant may have a valid *Brady* claim even if there would

*Jackson*, 2010 WI 135, ¶¶ 69-72 (footnotes [renumbered] in original).

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.   To establish a *Brady* violation, a defendant must demonstrate (1) that the prosecutor willfully or inadvertently suppressed evidence; (2) that the evidence was favorable to the defendant, either because it was exculpatory or because it has impeachment value; and (3) the evidence material such that prejudice ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985). To establish materiality, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "A 'reasonable probability' of a different result is [] shown when the government's evidentiary suppression 'undermines confidence in the outcome of trial.'" *Id*. (quoting *Bagley*, 473 U.S. at 678).

The United States Supreme Court has not held that the rule in *Brady* applies in the context of a prison disciplinary proceeding.  In that respect, the Supreme Court has recognized that prison disciplinary hearings are "not part of a criminal prosecution" and

---

still be sufficient evidence to affirm his conviction. *Strickler v. Greene*, 527 U.S. 263, 290, 119 S. Ct. 1936, 144 L.Ed.2d 286 (1999). Under the facts presented by this case, we need not and do not determine whether any version of *Brady* — limited or otherwise — applies to prison disciplinary proceedings.

that "the full panoply of rights due a defendant in such proceedings does not apply." *Wolff*, 418 U.S. at 556 (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)).

Assuming nevertheless that *Brady* does apply in the prison disciplinary context, the Wisconsin Supreme Court concluded that the video evidence was neither material nor exculpatory.   Jackson fails to demonstrate otherwise or refute this conclusion. Accordingly, Jackson fails to establish a violation of *Brady*.   More importantly, he does not demonstrate that the Wisconsin Supreme Court's decision was contrary to or involved an unreasonable application of clearly established precedent from the United States Supreme Court.   Because none of Jackson's claims qualify for relief under the standard found in 28 U.S.C. § 2254(d), his habeas petition must be denied.


ORDER

IT IS ORDERED THAT:

1.  The petition filed by Darnell Jackson for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED and this case is DISMISSED with prejudice.

2.  The clerk of court is directed to enter judgment for respondent and to close this case.

Entered this 22nd day of December, 2014.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge